Amanda S. Reynolds, Esq.
Attorney for Plaintiffs, *Pro Bono*
3 Harvard Drive
Woodbury, New York 11797-3302
(516) 838-0715
InMercyAmandaReynolds@gmail.com

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NEW YORK EASTERN DISTRICT – CENTRAL ISLIP

| | |
|---|---|
| AMANDA REYNOLDS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MERCY INVESTMENT SERVICES, INC., MERCY EDUCATION SYSTEM OF THE AMERICAS, SISTERS OF MERCY OF THE AMERICAS MID-ATLANTIC COMMUNITY, INC., OUR LADY OF MERCY ACADEMY, CORP., SISTER LISA GRIFFITH, Executive Director, MARGARET MYHAN, OLMA President, PATRICIA DILOLLO, OLMA Director of Advancement,<br><br>Defendants. | Civil Action No.:<br>_____<br><br>***Document Electronically Filed***<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF BASED ON:**<br><br>**(1) FRAUD**<br>**(2) BREACH OF FIDUCIARY DUTY**<br>**(3) BREACH OF CONTRACT**<br>**(4) UNJUST ENRICHMENT**<br>**(5) VICARIOUS LIABILITY**<br><br>**JURY DEMANDED** |

Plaintiff, AMANDA REYNOLDS, individually and on behalf of a class of similarly situated persons, by and through counsel, hereby commences this action against Defendants MERCY INVESTMENT SERVICES, INC., MERCY EDUCATION SYSTEM OF THE AMERICAS, SISTERS OF MERCY OF THE AMERICAS MID-ATLANTIC COMMUNITY, INC., OUR LADY OF MERCY ACADEMY, CORP., and MARGARET MYHAN, and alleges as follows upon information and belief:

1

## CLASS CERTIFICATION

1.      Plaintiff brings this suit individually and on behalf of all others similarly situated pursuant to Rule 23(b)(2), (b)(3), (c)(4) of the Federal Rules of Civil Procedure.  Plaintiff sees certification of Nationwide and state and subclasses as set forth herein, including all Mercy-educated stakeholders affected by the foregoing scheme orchestrated by some or all Defendants in concert with potential not-yet-named Defendants who worked in concert with presently-named Defendants, as subdivided by school affected and, therefore, by geographic location.

2.      Additionally, Plaintiff is a member of and seeks to represent a New York subclass pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), defined as:   All Mercy-educated stakeholders who were affected by the foregoing fraudulent scheme orchestrated by Defendants.

3.      **Numerosity:**  Fed. R. Civ. P. 23(a)(1).  The Class Members are so numerous that joinder of all Members is impractical.  While the exact number of class numbers is unknown to Plaintiff at this time, upon information and belief, Plaintiff expects the Class size to consist of millions of members.

4.      **Commonality:**  Fed. R. Civ. P. 23(a)92) and (b093).  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members.  These common questions of law and fact include, without limitation: a.  whether Defendants owed duties to Plaintiff and the proposed class, the scope of those duties and if they breached those duties; b.  whether Defendant's conduct was unfair or unlawful; c.  whether Defendant breached its contracts with Plaintiffs and the proposed class; d.  whether Plaintiff and the Class have sustained damages as a result of Defendants' conduct alleged herein and, if so, what is the proper measure of such damages; and e.  whether Plaintiff and the Class are entitled to recovery and injunctive relief.

5.    **Typicality:** Fed. R. Civ. P. 23(a)(3).  Plaintiffs claims are typical of those of other Class Members because Plaintiff is an alumnus of Our Lady of Mercy Academy and a donor, and, therefore affected by Defendants in a similar fashion to other Plaintiffs.  Plaintiff, though not presently a student, was a student and, therefore, is similarly situated to those students who are presently students.  Plaintiff advances the same claims and legal theories on her behalf and on behalf of all other class Members and there are no defenses that are unique to Plaintiff.  Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

6.    **Adequacy of Representation.**  Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent the interests of the Class in that she has no disabling conflicts of interest that would be antagonistic or adverse to the Class Members.  Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she suffered are typical of other Class Members.  Plaintiff is an attorney experienced with class action litigation and Plaintiff intends to prosecute this action.

7.    **Superiority of Class Action.**  Fed. R. Civ. P. 23(b)(3).  Class litigation is an appropriate method for the fair and efficient adjudication of the claims involved.  Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require.  Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations,

like Defendants.  Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

8.      The nature of this action and the nature of laws available to Plaintiff and the Class make the use of class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged, and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

9.      The litigation of the claims brought herein is manageable.  Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a Class Action.

10.     **Adequate Notice:** can be given to Class Members directly using information maintained in Defendants' records and on the Change.org petition or those who have formed a coalition to preserve Our Lady of Mercy Academy and/or other schools.

11.     Likewise, particular issued under Rule 239c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and parties' interest therein.

## FACTUAL BACKGROUND

*Our Lady of Mercy Academy*

12.    Our Lady of Mercy Academy ("OLMA") is one of only two private, Catholic all-girls high schools remaining on Long Island.  The school's mission is dedicated to providing a comprehensive education grounded in the charism of Catherine McAuley, foundress of the Sisters of Mercy.  Guided by the principals of Fides, Mores and Cultura (Fidelity to Principle, Moral Integrity and Enrichment of Life), Mercy provides a compassionate environment in which faculty fosters the spiritual, emotional and intellectual growth of the students endeavoring that Mercy graduates will be authentic witnesses of Catholic values throughout their lives.

13.    The Academy is run by the Sisters of Mercy of the Americas, who merged with the Sisters of Mercy of Brooklyn.  In 2017, Mercy Education Systems of the Americas ("MESA") came in and appointed new leadership and created a new leadership, Principal-President model, thereby segregating the roles between it and OLMA.  The President was responsible for all the finances and the Principal was responsible for student performance and reported up to the President.  The President then reported up to MESA, who reported to Sisters of the Americas and, it follows, Mercy Investment Services, its financier.

14.    The class of Plaintiffs who are aggrieved by Defendants' collective actions constitute: OLMA students, parents, alumnae and donors.  The class of Plaintiffs aggrieved also include the individual Sisters of Mercy, who donated their time, money and legacy to OLMA in accordance with their vows.  The class of Plaintiffs aggrieved, must also, therefore, include all of the foregoing aforementioned stakeholders with respect to each

and every Catholic Sisters of Mercy school forced to close at Defendants' behest, including Mercy San Francisco (2020) and others to be revealed during the course of discovery.

*Mercy High School San Francisco Closure*

15.     Relatedly, the most recent closure of a Mercy school occurred in 2020 in San Francisco: Mercy High School was a Catholic all-girls college-preparatory high school part of the Roman Catholic Archdiocese of San Francisco, sponsored by the Sisters of Mercy in Dublin, Ireland.  In January 2020, Mercy San Francisco announced that it would close at the end of the 2019–2020 school year, citing decreased enrollment figures, a shrinking endowment, and the high cost of living in San Francisco that made private school tuition difficult to afford for many families.

16.     Mercy San Francisco's *nearly identical* closure announcement stated:

> The combination of decreasing enrollment, the lack of a significant endowment, and rising operating expenses has made it impossible for the school to maintain financial stability. The basic demographics and economics in San Francisco have changed and many families can no longer afford to live in the city and pay tuition on top of the cost of living. The mission of the Sisters has been to educate young women, regardless of the ability of their families to afford a Catholic education.

17.     Mercy San school was built in 2001 and, much like Our Lady of Mercy Academy, was dedicated to Catherine McAuley. The school permanently closed in the summer of 2020.  Its then students, who expected a four-year high school term, were displaced abruptly with no school to call home.

18.     In that scenario, the school was sold to an international, Chinese American International School ("CAIS"), for Forty Million ($40,000,000.00).

OLMA's *January 8, 2024 Closure Announcement*

19.     On January 8, 2024, the Board of Administration of Our Lady of Mercy Academy announced its June 2024 closure to its students, alumnae, including Plaintiff, and its "Circle of Mercy."  This was the first time OLMA and Defendants notified OLMA's stakeholders (its students, alumnae, donors, parents, and the community) of the impending closure.  According to Defendants MESA, Sisters of Mercy and OLMA Board, the first they were made aware of the decision was two days before Christmas.

20.     Our Lady of Mercy's closure announcement to its alumnae stated, in part:

It is with great sadness that we announce the closing of Our Lady of Mercy Academy at the conclusion of this school year.  This difficult decision was made because of changing demographics and lower enrollment which has decreased by 45 percent in the past 10 years.  This announcement comes as a result of extensive deliberations by the school's leadership and governing boards:  OLMA Board of Directors, Mercy Education Board of Directors, and the Institute of the Sisters of Mercy, who have tirelessly worked to sustain the school's viability in the face of many evolving educational landscapes.

21. Upon hearing this news, Our Lady of Mercy Academy stakeholders (also known as "The Circle of Mercy" or, now, "The Lion's Den") began a campaign to preempt the impending closure, initially starting a Change.org Petition garnering over 7,000 signatures, a GoFundMe page started by present student advocate, Grace Werner, and then converting those endeavors into a non-profit.

22. Meetings were conducted with students, parents, and e-mail communications were disseminated.  On January 16, 2024, "An Important Message from Our Lady of Mercy Academy" email was disseminated from Defendant, President Margaret Mayan, which acknowledges that the students, parents and alumni hoped to: identify new fundraising initiatives and commitments to reverse the closure of the Academy; have an opportunity to engage in an in-person meeting with the Institute Leadership Team; and gain clarification

on the possibility of selling/leasing the OLMA property owned by the Sisters of Mercy to offset the deficit and sustain OLMA.  In response, MESA issued a letter by Sr. Lisa Griffith and Mr. Terry Quinn.

23. The Mercy Education Systems of the America response stated simply, in part, that MESA was not interested in allowing Our Lady of Mercy Academy supports the opportunity to save its school: "1.  The vote and approval of closure is final and will not be reconsidered. Neither the Institute Leadership Team nor the Mercy Education Board of Directors will engage in discussions about emergency fundraising to reverse these decisions, […] and (3) the building and surrounding land of Our Lady of Mercy Academy is not part of the closure process; the future use of the building and adjacent land has not been determined.  There are no [present] plans to sell or repurpose the building or the property."


*January 16, 2024 Alumnae Association Zoom Call With Defendants*

24. On January 16, 2024, representatives from Defendant MESA and the Board of Directors of the OLMA Board conducted a Zoom call with its stakeholders and Alumnae to address questions posed prior to and during the conference.  A transcript of this Zoom call is annexed hereto and the statements made therein are incorporated herein as if fully set forth within the four corners of this Complaint.

25. The statements made during the call constitute factual claims by the parties.  The Zoom recording is available at: **https://us02web.zoom.us/rec/share/Y4o4kJ0M_upFlB9oo3mtJy9XnsRHvnLAiPaOc aqz9eOWfFl1mc1_7Uq1jVKffJk-.hoCvsi7eB_ucuvxq** and the meeting passcode is K#WT8#PS.

26. During that Zoom Interview, Defendant, Sister Lisa Griffith, the Executive Director of MESA, represented as follows with respect to the defendants' hierarchy: MESA infiltrated the school in 2017. Sister Griffith stated that MESA's role has two primary functions: (1) to provide programs and services to all ministries and (2) to provide governance oversight with the schools. According to MESA, via its representative, Sister Lisa, the local school boards have a definite responsibility in leading the charge for having oversight and their own responsibilities, though MESA does provide best practices due to high Board attrition.

27. Sister Lisa represented that the school's closure was due to finances. The present cashflow would result in a "sizeable deficit" by August 2024; the school is operating at a deficit now. It was ultimately the decision of MESA to recommend the school's closure. MESA then requested approval for closure through the Institute Leadership Team, vis-à-vis the Sisters of Mercy of the Americas and Mercy Investment Services.

28. Sister Lisa further stated that MESA will not reconsider its vote based on information that is not concrete, meaning, unless she had actual donation-backed dollars, she would not consider the stakeholders' efforts to fundraise. Sister Lisa also iterated that the Institute Leadership Team would not consider capitalizing on the fact that Mercy sits on 96 acres of property and would not borrow against the property or consider financing with respect to the real property whatsoever.

29. Notably, representatives from Mercy Investments were not present at the meeting and did not also state or concur that there were no plans with respect to the property.

30. It was clear from this meeting that despite thousands of promised dollars from its stakeholders, and even donations that were pledged but not expedited, MESA refuses to

entertain the valiant efforts of its stakeholders to keep OLMA open.  This 95 year-old institution, empowering women across America, will have to shut its doors.

*Defendant Mercy Investment Services, Inc.*

31. Defendant Mercy Investment Services, Inc. According to the Mercy Investment Services website, every six years, the Sisters of Mercy of the Americas hold Chapter to set direction and elect leadership for the coming years.  In 2017, Mercy Investments had a call to "intensify their efforts to align their investments with their values" related to extractives. That same year, in 2017, the Sisters of Mercy elected a new Institute Leadership Team, who took office in August.  The five Sisters also serve as the Members in Mercy Investment Services' two-tiered governance structure were: Suster Sue Sanders, RSM, president; Sr. Pat Flynn, RSM, Vice-President; Sr. Terri Bednarz, RSM Counsilor; Sr. Judith Frikker, RSM, councilor; Sr. Maureen King, RSM, councilor. (That same year, the Our Lady of Mercy bylaws were revised.)

32. According to the investment company, "The Sisters of Mercy, in the spirit of their founder, Catherine McAuley, committed to using their investments to advocate for systemic change and enhance their financial resources for the mission and the support of their members. Building on decades of work in their history, the Sisters of Mercy created Mercy Investment Services, the asset management program for the collective investment and professional management of the endowment, operating, and other funds of the Sisters of Mercy and their ministries that chose to participate.  The centralization of investments occurred on February 1, 2010 and purported to increase the net investment returns of the participants while continuing the Sisters' decades-long work for systemic changes.  The

program provides its participants with increased economies of scale, diversification, liquidity, and governance and oversight."

33. The Mercy Partnership Fund is the global community investing program of MIS and provides below-market investments to mission-driven organizations and projects that provide high social and environmental impact.

34. Again, according to the Mercy Investment Services website, what happened was: in the early 1970s, several provinces formed the Mercy Consolidated Asset Management Program (MCAMP) to collaboratively invest their funds and encourage more just business practices among the companies in which they invested. In 1995, MCAMP created an Alternative Investment Fund, giving participants the option of contributing a portion of their investment to the community investing fund. As the sisters' collaborative investment strategy grew, MCAMP evolved into Mercy Investment Program and incorporated the Alternative Investment Fund. Renamed Mercy Partnership Fund in 2003, the fund became part of Mercy Investment Services in 2010, and now, a portion of every participant's investment supports community investing. Today, Mercy Partnership Fund loans to more than 60 investees with investments in 59 countries and throughout the United States. These investments support affordable housing, financial inclusion, education, business, cooperative and nonprofit financing, community facilities, health care, healthy food, environmental sustainability and sustainable agriculture.

35. In 2023, MIS launched an initiative within the Mercy Funds and 80/20 Sponsored Ministry Fund to address the ongoing concern for racial equity and justice. The Inclusive Fund invests in groups who have been shut out of traditional capital markets and "overlooked" by "mainstream" investors.

36. Mercy Investment Services was also involved in the San Francisco school closure, upon information and belief.

37. Mercy Investment Services maintains several other committees comprised of lay people and nuns, including the following: Members; Board of Directors; Investment Committee; Social Responsibility Committee; Mercy Partnership Fund Subcommittee; Audit Committee; Governance Committee; Compensation Committee.

38. MIS' approach to investments includes: (1) Portfolio Screening; (2) shareholder advocacy; (3) proxy voting, and (4) impact investing. Portfolio screening is a way to make a decision based upon the values of the organization or, the key concerns of what we decide we will not own in the investment program.

39. Portfolio screens are a way to make a decision based upon the values of the organization and what again are key concerns. The Sisters of Mercy portfolio screens to avoid investing in certain companies whose products, services or activities contradict its guiding principles. Similarly, it actively seeks investments aligned with the guiding principles of the Sisters of Mercy.

40. Shareholder advocacy is a means by which MIS encourages the companies they invest in to make changes that benefit the community. They raise issues that concern the Sisters of Mercy to ensure that companies consider the impact of their business. Currently, MIS engages 152 companies through 213 engagements. Proxy voting is used by actively voting company proxies using the Mercy Investment Services Proxy Voting Guidelines approved by the Social Responsibility Committee. In advance of a company's annual shareholder meeting, the company releases its proxy book, which includes all the resolutions for shareholders to consider and on which to vote. MISS, through ISS proxy voting service,

votes all of its proxies in accordance with guiding principles focused on governance, social and environmental criteria.

***Mercy Investments 2023 Accountability Report***

41. Notwithstanding the foregoing "vision", MIS' 2023 Accountability Report was negative overall.  The company had a negative absolute return in 2022.

42. It cited "global inequity investment manager performance" as the primary detractor.  Put another way, the Company was blaming its performance on its proxy voters, rather than itself.  Though it claims that it diversified its portfolio, which is responsible, the company stated that its "responsible" diversification was unrewarded.

43. Immediately after that statement, the company sited that despite clear statistics inviting investment in certain stocks, the company simply chose not to invest in what the rest of America did, which was characterized by MIS as investing in "large-cap, volatile, growth stocks" found in the "artificial intelligence and related technologies" sector."  These stocks outperformed value by nearly 24% in the first quarter of 2023.  MIS claimed major American investing services benefited from what they called "euphoric" investment in "risky" stocks, despite also citing the fact that 7 stocks comprised 99% of the S&P 500's revenue and the Nasdaq had the best first quarter ever with 39% returns.  They concluded that despite their unrewarded responsible investing, that the Funds' net returns were "in line with their respective benchmarks since inception."

44. The Mercy Investment Services Investment Return Record Trailing Annualized Total Return Next of Expenses as of June 30, 2023, showed the largest net expenses in the "Global Equity" fund.

45. Mercy Investment Services was involved in other school closures and postured the real property of those Catholic schools to be sold for profits, after the schools were forced into the ground due to malfeasant business operations.

46. Mercy Investment Services capitalizes on the Sisters' of Mercy requirement that funds donate to Do-Good investments only, and the fact that the Sisters' tax filings include beneficial privacy due to their status as a religious organization. In this way, together with its misrepresentations of investment performance, the Investment services can evade liability since the Sisters' entity as a religious organization enables their privacy to continue misappropriating its funds.

47. Mercy Investment Services then sets up MESA as a strawman to further immunize it from liability, while directing recommendations for school closures from the top down.

48. Our Lady of Mercy Academy never had a chance once MESA and its parents took over.

*MESA Involvement with Mercy*

49. Even though MESA only imparted the formal decision to close on December 23, 2023 (allegedly), it had known of the school's impending demise years before. In fact, as Plaintiffs claim, it orchestrated it. For instance, with respect to OLMA, on April 5, 2018, MESA sent a letter to Mrs. Margaret Serravalli, Chairperson of the Board of Trustees, and Ms. Margaret Myhan, President of Our Lady of Mercy Academy, on behalf of the MESA Board and review time. This letter provided a recommendation for OLMA Administration to: continue working to bring down the deficit in OLMA's annual budget; maintain the development of a strategic initiative for financial aid and recruitment, and to develop a formal succession plan for administration, faculty and staff. This letter was sent by Sr. Richard Mary Burke, RSM (Board Chair), and Sr. Lisa Griffith, RSM (Executive Director).

50. Importantly, Our Lady of Mercy Academy's 2020-2021 Annual Report indicates that it raised $6,049,099. Its Total 2019 Revenue was: $7,237,636; its Total Expenses were: $7,492,456.

51. Its Reaccreditation Report in 2019 provided no recommendations for improvement with respect to its Plan for Growth and Improvement in the financial operations, budget, fundraising, capital campaigns or otherwise. The Alumni, a Band of Sisters, has banded together indicating a willingness to raise more than the amount needed for viability through its network and a newly-founded Not-For-Profit, "Our Lady of Mercy Academy Preservation Coalition." The current administration refuses to entertain any fundraising.

52. Based on the recent trend across the United States in Catholic school closures with associated real property transfers of those multi-million dollar school properties, the OLMA students, parents and Alumni herein aggrieved humbly seek recourse in this Honorable Court and will also seek an injunction prohibiting the sale of the property, allowing OLMA's supporters to revive its beloved school and to oust the present Board and leadership.

53. Notably, Defendants have not provided Plaintiffs with any concrete accountings, audits, budgets, enrollment figures, specified and measured concrete plans for repurposing the school, or any other concrete statistics to date. Their Capital Campaign funds were represented to be zero-sum in a 2020-2021 Capital Campaign statement located on its website.

54. Despite knowing that the school was nearing its demise, the Defendants continued to collect donations and never communicated the school's closing until January 8, 2024. Therefore, Plaintiffs claim Defendants knowingly and intentionally were involved in this

scheme orchestrated by Mercy Investment Services from the top down. As a result of their involvement, these defendants who are named personally engaged in conduct outside the scope of their employment duties, and are sued herein individually.

55. The statements made during the January 17, 2024 Alumnae Association meeting were transcribed by Plaintiff, Amanda Reynolds, and are set forth hereinbelow.

56. The transcription constitutes representations made by the parties and are presumed to be true:

**Barbara Ramsey Kiley '64 (Alumnae Association President):** I warmly welcome all of you fellow Alumnae of Our Lady of Mercy Academy. My name is Barabara Ramsey Kiley. I'm the President of the Alumnae Association. I'm from the Class of 1964. The proud class of 1964.

This is our regular January meeting. We have four meetings every year and this is our regularly scheduled January meeting. I thought it would be a nice thing tonight, as we always open up with a prayer, I thought it would be a great thing to begin with the Prayer of Catherine McAuley.

[Whereby a Prayer was read together]

Ladies, I would like to warmly welcome you to this meeting. I'm going to introduce Virginia Ewen of the Class of '76 who is the Chairperson of the Board of Directors. Ginny, are you on the meeting?

**Chairperson of the Board of Directors, Virginia Ewen '1976:** Thank you all for joining us this evening. I am going to read my statement so I am sure not to leave anything out, that I would like to get across to each of you, the alumni, who treasure your memories of our school. Believe me, I know how you upset you are to hear this awful news and I want you to know how hard many of us have been working to turn this around for quite some time. Many of you know I am an Alumnae of the Class of 1976 and that my three daughters are alums, and that I have been active in this Alumnae Association since its start.

Like some of the women joining us tonight, we've worked on committees, we've brainstormed for ideas to entice many of you to come back to our school and join our events. What we are discussing tonight is a tsunami that is the result of several perfect storms. The Board of Directors, that consists of Alumni, past parents, Sisters of Mercy who have devoted time, talent and treasure to our school are heartbroken over this decision. I'd like to give you some facts that may answer your questions.

We'll begin with enrollment. We have 38 girls in our freshman class. We have just under 200 girls in our school; each year enrollment has been declining. You hear about changing demographics, so let me tell you a little about that. There have been fewer students and even fewer girls taking the entrance exam over the past few years. Our feeder Catholic Grammar schools on

Long Island have decreased. We used to have 95 Catholic grammar schools here and we now have 25. Finally, when many of us attended Mercy, our parents paid full tuition and when the Sisters needed a project done, the Sisters called our parents and asked them for the money to complete these projects. Nearly half of our students in the school now receive financial aid in the form of scholarship and a good number of our students will be the first in their families to attend college.

We worked very hard this year at open house, visiting more schools than we have ever visited, even the non-Catholic private schools, hosting events for CYO programs, camps, reaching out to CCD programs and many other innovative ways to get our schools into the eyes and minds of potential students and families. Although we were hoping that we would have a larger freshman class than we have this year, there was no guarantee of that and there was no quick turnaround. Unfortunately, we were not given the opportunity to find out because this decision was made just before acceptance letters were to go out.

Next, fundraising. As all not-for-profit organizations, we relied heavily on fundraising and support from alums and outside donors. Fundraising helps us pay a significant portion of our operating expenses. Unfortunately, the COVID epidemic impacted our ability to hold fundraising events for several years. When we were able to return to holding these events, the revenue has not reached pre-COVID numbers yet. We were hoping that this year, they would.

Pat will give you some of the results of our annual appeal outreaches. We have reached out to foundations, potential large donors, other educational entities and have met with some success, but the results have not kept pace with our rising expenses.

The cost of educating a student at Our Lady of mercy is just above $30,000. Tuition is kept at just slightly above $15,000 for several reasons. There are eight catholic schools on Long Island, not counting Chaminade, which is not one of our competitors. All of these schools agreed to keep the tuition at approximately the same rate. An increasing number of students receive financial aid and some receive scholarship; in fact, nearly 68% of our freshman class receives financial aid. The cost associated with educating our students in a way that is required (AP Classes, sports teams, varied curriculum, clubs). Remember, we now have no religious faculty or staff other than we did have Sister Theresa last year, but that also impacts our costs. Our Sisters worked out of their personal love and commitment to our school with very little pay, just a stipend and the cost of faculty costs and benefits do continue to rise, as you are aware.

Our rigorous curriculum comes at a high cost.

Finally, the property. We do not pay rent to the Sisters of Mercy; however, the school pays all costs for the maintenance and upkeep of the property. This includes a recent $1M repair to the roof; a $60,000 repair to the boiler that we are undertaking right now to try to put off replacing the heating system for several million dollars. The annual cost of maintaining this property is greater than $750,00 each year. Major repairs to the kitchen, refrigeration system and the heating system are coming due. We have been working on grants to help us with these costs and, please know, that ideas of selling or leasing parts of the property have been part of our proposals during this process. As you can see this has not been a sustainable model for some time. We have tried many,

many things to turn this around.  Believe me, many of the things you have asked about have been considered and proposed.

We have also sought the counsel of outside partners and advisors.  A co-ed school would have come with a large capital expenditure.  Unfortunately, the resources funds needed for the school to operate cannot support a phase-out closing.  Ours is not a one room schoolhouse where we can wind up with one or two grades lead by one or two teachers.  A high school needs all of its subjects and all of the teachers to go along with that.  It needs AP classes in special subjects, it needs special subjects, it needs sports that need to be coached by several coaches, it needs many different pieces to be competitive to be the academically, athletically and socially rigorous school that we know.

I want to assure you that this is not a lack of effort on behalf of the Board of Administration or the staff of Our Lady of Mercy.  We had a strategic plan that was being followed and executed.  For the last six months, we concentrated all of those efforts on enrollment and fundraising.  Our finance and investment committees have regularly met and exercised proper oversight.  Every member of our board joined this effort because of their love and devotion to this school.  No one wants to see it closed.  We have all hoped and worked for more time to see this around, you have my assurance of that.  I hope we can try to use the remaining time to celebrate all that we love about OLMA.

Our Board of Directors reports to Mercy Education and they report to the Mercy Education Board of Directors who reports to the Institute Leadership of the Sisters of Mercy.

At this time, I'd like to introduce Sister Lisa Griffith, who is the Executive Director of Mercy Education.  She is here to represent the Sisters of Mercy.

**Sister Lisa Griffith (MESA):**  Thank you, Ginny.  Good evening, everyone.

I serves as the Executive Director of Mercy Education and have been in this role since 2017 when Mercy Education was formed. First and foremost, I wish I was not at this meeting tonight.  None of us wanted to be part of making this decision or delivering this decision to any of you.  I am aware of how difficult this is to hear and to process through, but have given my word to the Sisters and to the School community that I will continue in this journey process with all of you, that will lead us to the closure.

In the structure of Mercy Education, there is a deep respect for the levels of authority that are present.  First and foremost, of your local board and administration.  We all believe in the subsidiarity (sic) of making decisions and being involved at the closest possible level to whatever is going on -- and that is your administration and the board.  Our role as Mercy Education, I guess you could say has two primary functions: (1) is to provide programs and services to all or ministries and the other (2) is also to provide some governance oversight with the schools.

And, and it's an  understanding, again, that your local boards have a definite responsibility to the school in leading the charge for having oversight and their own responsibilities.  It is not our job to take those responsibilities away from them, but many times we do help guide and give best practices to the Boards because there is always turnover of Board members, who are volunteers who give their time and service to the school.  Each of them have their areas of expertise which they bring to the Board, but many times, some people may or may not have ever served on Boards

or non-profit boards.  So we try to give guidance and oversight and best practices in working with the schools.

The decision process happens at three levels.  The board looked at many options and ways to turn the school in a different direction.  This decision [to close Mercy in June 2024] is not about the school not living out its Mercy Catholic identity; that has never been in question and that identity is very much alive.

In this case, the foundational driving force is finances.  The school in her cashflow projections would run out of available cash to help support the school as of August 2024, and there would be a sizeable deficit budget.  The school operates under a deficit now and would operate in a deficit going into the future.  Mercy Education made the recommendation to the OLMA Board to make serious consideration for closing the school.  They [The Board] did not want to do that; they [OLMA Board] came back and forth to us to talk about different ideas.

But when we felt like exhausted those, the local Board voted to close the school, made the recommendation to Mercy Education; Mercy Education approved that and supported that decision. We, Mercy Education Board, requested from the Institute Leadership Team -- in their role, and this gets a little technical, but in their role as having oversight or being the member or the corporate member for Mercy Education – they have a significant role in that separate from who they are as an Institute Leadership team leading the Sisters of Mercy.  So there are two different roles there. Mercy Education recommended to the Mercy Institute Team for the closure and they did support that closure.

So, one of the questions was who makes the final decision and if you want to put that – I would put that on Mercy Education because Mercy Education has to approve the recommendation from the local and we have to recommend it to the IOT and in both cases we did that.

I know that all of you received the communication from the school today following last week's meetings and some clarifications that we were asked to address.  In that it talks about is the decision final? Yes, that decision is final.  Mercy Education nor (sic) the Sisters of Mercy in their capacity as the corporate members will be reconsidering their vote.

The property is not part of the decision of the school.  There is/there are zero plans as of this point and in any time in the future, the Sisters of Mercy have not talked about, are not planning to talk about, within the near future, the future use of the building or the adjacent land that is attached. There are no plans to sell or repurpose that at this time.

The last piece was, to be able to hear from the Sisters of Mercy and in our role as the way we are structured, the Sisters of Mercy have designed Mercy Education to take the leadership of the schools, so any Institute Team would say, Lisa, you are the person who is to answer all the questions and that is my role as Executive Director, to work with the schools and try to support answering any questions I possibly can with any of the stakeholders, that I would be the spokesperson for the Sisters of Mercy in this case.

**Pat DiLollo, Director of Advancement:**  I think many of you know me, I'm Pat DiLollo, Director of Advancement, an alumni from the Class of 1970 and have been working at Mercy for the past 20 years.  This school means a lot to me and I've loved working with all alums.

I want to talk a little bit about the Alumni Association.  We formed it about 15 years ago for the sole purpose of engaging our alums.  For many years, as the older alums know, we did a poor job in reaching out to our alumni base, which could be the reason why we still don't have the support that we would need.

So, for the past 15 years we have been trying to work on getting our alums involved through events, mentoring programs, networking opportunities in different areas.  The basic thing that we really had a tough time doing because we need volunteers was to significantly increase class reps and get that all together.  That's really my biggest disappointment, as Barbara or Ginny said, we have four or five meetings a year.  We started out all in person since COVID, we offered both through virtual and in person.

So, I take that responsibility.

As far as fundraising goes, we do two major fundraising efforts a year: our Annual Fund Appeal and our Challenges.  I have some numbers, "but we wont' go there because" we have 8500 alums, 5200 that we know kind of where you are, we might have an address or an email., so we kind of know where 5200 of you are.  For most appeals, we average 200, 250.  We are lucky if we may get 400 donors from our alums.

The other thing with our fundraising efforts is that it is two-fold: it is our direct mail or social media appeals and the other part is our efforts at Mercy with our current parents.  So we have the Mother-Daught eFashion show the Father Daughter Dance, the Golf Outing the Grandparents luncheon.  The net amount from these events help our operating budget.

A number of years ago, pre-COVID, our net amount from our Fashion Show would have been around $80,000.  This year it was $25,000.  And that's a product of our enrollment.

In the past, in 2018, we had 114 seniors graduate.  This year we have 55.  So all of this impacts our ability to raise funds.  We realized before COVID that we needed to work on an endowment and that's when we began a Capital Campaign.

Unfortunately, the timing was not great.  The week we announced the campaign we got locked down by COVID.  So the timing was not good.  But I do want to thank all of our alums that are on this call who helped, they were captains, they reached out to their classes and of our 5200 alums, 234 either made pledges or a one time gift.

The monies from the capital campaign: $6M was pledged.  We are still trying, and it was a 5 year commitment.  So outstanding, there's still a million and a half outstanding in pledges.  We have done renovations to the school and I know some of you have questioned why we did those renovations.  The gym was built in 1979, it needed it.  For us to remain competitive with other schools.

We felt we could do to increase our enrollment and that's what we were – that was our thinking. We also wanted to increase our endowment and through the campaign there were a number of donors who wanted to have named scholarships, so those scholarships are in restricted accounts and we would just sue the interest from these investments to do scholarship.

As you know, the stock market has not been that great, so the return has not been there.

Right now, some of those donors are asking for their money back because we have not given it out, so there is another $600,000 that will be going back. We have used some of it for our operating budget for our financial aid. So that's basically, you know, where we are with the campaign.

I know we had some questions and I also want to thank you for writing in your questions because it really helped us to be able to answer and address them.

We are planning to have an other meeting in February. Anyone that would like to be a class rep, they would be the keeper of their class lists.

We are planning an event in June, as the celebration of the 95 years. We would also like your help with that.

I know there's a question about transparency, we are working hard on enrollment. We really believed that we would be increasing our enrollment for the next school year. If we were to put it out to our alums the situation we're in, it would have been out in the public in a day. That was my fear and others as well. And then, what would that have done to our enrollment.

The other thing I want to say is, for those of you who do not live on Long Island and have not been aware of all the closings of Mercy schools (Mercy Riverhead, Little Mercy in Hicksville and Mercy in Cutchogue), now to the average family who does not know about us, all they hear is Mercy. So the rumor has been on the street for a good five years that we are closing and – how do you fight that.

That's basically, you know, what I wanted to say.

[At this time, the conversation was directed to Amanda Corbo, OLMA Director of Marketing, to discuss questions presented by the Alumnae and stakeholders prior to the call.]

## QUESTIONS

**Amanda Corbo (OLMA Director of Marketing):** For Sister Lisa, When did Mercy Education step in to give guidance and best practices? As the Executive Director, why didn't you come in to demand a restructure earlier?

**Sister Lisa Griffith:** We have been working with the school since 2017, since we have been in existence. The school's enrollment has been on the decline at least since that point when we have been tracking enrollment information and so have been working with the school on different scenarios and ways to improve since then.

The whole thing about restructuring, yes there is a sense that this is a business but we don't operate that way. We don't operate by coming in and saying we're taking over. Our role is to try and our

desire is we are much more collaborative than that. We sit around the table together and we work at this together and if we can't find a solution then we say that. But we are not a corporate business and we would not – our desire was never to do that it was always to be collaborative and be collegial partners with one another.

**Pat Dilollo:** We were working on the Alumni Association recruitment the last year or so, the focus being on a stronger alumni association and getting the class reps you know, really focused on helping us. So yes, we were working on it.

**Alumnae Question:** Now that the Alum have been made aware, we can change the direction with the narrow minded decision. Why were alums excluded from the decision. Why are they so aren't we stakeholders and why are we not being allowed to use our skills to resource and reverse this decision?

**Sister Lisa:** I think the relationship with the alums is with the administration of the school and how they engage so I would leave that to someone else to answer, and I, there's a question on here about Mercy Investment Services, which is totally, totally different. So, I don't know, Galen, maybe we can have a discussion offline or whatever to explain that organization but it really has nothing to do with the school at this point.

I know I didn't answer your question about tapping the alums and all that and that, you know, I know that was discussed at the board and how to more fully do that in seeking that support.

**Virginia:** I reiterate what Pat said which was, we really walked a very careful tightrope of working to get support, well we did send a letter and most recently also an email out to alums asking for more support in a stronger way than we usually did. We, as Pat said, we continued to hope that we would not have to close the school, so we could not say that we were in danger of closing the school because we would not have gotten – our outreach and our work for increasing our enrollment would have been in vain if we had said we were going to close the school. It was a tightrope of working to increase, um [reading from screen] to increase our fundraising and increase the assistance that we got. But we just couldn't – we felt that if we had said that the school was going to close, the students would have…[reading screen].

**Alumnae Question:** Can you please elaborate on that because I disagree – that people wouldn't rally if they knew the specifics about the school closing; even if it were to put us at risk, the risk is that the school closed and that's happening anyway, so what was the logic behind not flat out telling alums flat out what the situation was?

**Pat DiLollo:** Because it would have impacted our enrollment.

**Alumnae Question:** Right, but it was stated that for years we knew that was going to be an end result. So if that was already a foregoing conclusion, what was the risk of telling alumni exactly what was happening?

**Pat DiLollo:** We had an admissions team that was working hard. We really felt that if we could increase our enrollment and right size our school within the next year or two, we'd be okay.

**Virginia:** Closing the school was not a foregone conclusion. We did not believe that the school was going to have to close until, actually, a few days before Christmas.

**Katie Weiland (Class of '01):** So, then Virginia and team, first I appreciate the candor here. Obviously, we are incredibly passionate about this school and I think that you know, Sister Lisa, if anything that you hear as an Executive know that all there are, 5,000, if not 7,000 folks that have signed a Change.org petition if those folks give we can leverage our talents to be able to create a strategic plan that allows us to move forward. It is something I deeply think we can do and do well.

I myself come from a school-based background, I have been a Chief Talent Officer at a number of districts, I've done enrollment, I've done teacher recruitment. I've talked about buildings and ground; I've done budgets. This is possible.

So, I just, you know, echo what Maureen is sharing to say. I deeply understand the potential impact on enrollment, but I also think messaging matters.

There is not a girl at this school that does not have a seminal experience that deeply understands the power that Mercy brings and had you said to us, there is a real chance that Mercy might not be around, I would tell you right now I would give you $5,000 if I had it because this school changes lives at the end of the day.

I would not have my voice, I would not be a women CEO or a women leader in education – good bad or different, while the women of Mercy have many leaders, that's not how it works in other places.

There is a very strong group of women here that want this place to stay open. Not so much for ourselves but for the opportunity it brings to other women. So what can we do? Is there anything we can do to change to move the conversation forward, to new opportunities, understanding the decision was only made less than a month ago as was said?

Sister Lisa, do you want to address that question?

**Sister Lisa:** We are not going to – Mercy education will not reconsider its vote based on information that is not, concrete. So, yes there are a lot of names on the petition and there are some people who have given on the GoFund Me page, but we could sit around and do, "Well if we do this and if this is done what about this what about that – we are not going to engage in that type of dialogue. I mean, that's kinda spinning our wheels a little bit. You know, so, if there's concrete things,

**Katie:** Yes.

**Sister Lisa:** Then it's gotta be major. The school is not gonna be successful nor sustainable with $2M. It's not gonna happen.

**Katie:** Absolutely.

**Sister Lisa:** This is totally massive and it's gonna take a lot and I think you know there – you're right, there's a lot of powerful women on this call. I am not about to stand in the middle of a road with the powerful women that are on this call coming at me and trying to say this is what we can and can't do. I know what you can do. I know the potential that's out there. It's just will it happen or not.

**Katie:** Just a second, so what I'm hearing from you, is: if there is a strategic plan put in place, if there are actually actions in dollars put forth – and listen, I've done school budget, I run a school district for 26 schools. We are probably talking about $20M to get us right side again, right? And so, I think naming that is important, right? But understanding that there is as Pat said earlier, and Pat, I appreciate all the good work that you've done and I know this is hard to be on this call, but if there are a group of folks that are able to mobilize to augment the work to be able to get a plan, what I believe I'm hearing Sister Lisa is, because you're collaborative, because you want to be able to continue to do the good work, because it's possible, you'd be open to hearing it, is that right?

**Sr. Lisa:** I would say that's fair.

**Katie:** Thank you, I appreciate that.

**Sr. Lisa:** I mean, you know, I think we, you now, in fairness to the current students, faculty and staff, we can't stop the work towards transition. Because it's too many what ifs and unknowns and all that and I think that's part of the timing of the decision and the announcement is – we knew those incoming freshman students needed to be able to look at other schools so that they did not miss out on any scholarship or financial aid opportunities. We knew the current students needed to be able to do that to get their first choice classes because if the decision had been made down the line, students get what's leftover and we did not think that was fair.

The same thing for the teachers is that we wanted them to be able to look for position in the field of their expertise and not going to school saying I love you can teach these classes but these are what we need and if you need a job this is what you get. There's never a right time for making any announcement or any of these decisions and I think they had to be made in all fairness for the incoming students plus the faculty and staff.

**Katie:** We appreciate that. We know you have a lot of emboldened folks and appreciate your candor. I am just heartened by the fact that you know Mercy Girls Don't Quit and I know there are 100 of folks waiting to get on the line but I am heartened to hear that with a strategic plan with real action real people real numbers, you all might be open to that. There are too many women here that have stories frankly they've changed our lives, so I want you to know that from my heart and the hearts of many ladies this week. So I am going to cede the floor but thank you for listening.

**Question:** Someone wants to know how much did it cost to hire Lynch for your Capital Campaign?

Pat, if you wanna, even if you wanna discuss that:

24

**Patricia DiLollo:**  Well, it was more than, we wanted to spend, I'll put it that way because of COVID.  It lasted longer than 18 months.  So, as far as a percentage to our total raised, it was higher than the normal.  It was probably 20%.

So, they're asking, Pat, if we can kind of go through some of the questions that were sent to us that we have answers to.  So, I don't know.

**Alison Morris Roslyn (Class of '97):**  Hey Pat, can I just ask a quick question of Sister Lisa off of what Katie said, respectfully and out of curiosity if it's okay,

**Pat:** Sure

**Alison Morris Roslyn:**  I'm a Class of '97, I'm on the advancement Committee, I have hosted the fashion shows, I work closely with Ginny and Amanda Corbo and Pat and Margaret and I just want to say how much I love all of you and um I know we are going to talk about forward-looking things as much as we possibly can and I know a lot of people feel badly and I know we are upset and from a place of Mercy, I just want to say how grateful I am that you have spent so much of your lives giving to Mercy so I don't think we'd be there today without that and a huge thank you to Katie, because, that was awesome.

I do have a financial background and just a question that I'm wondering if we would even consider as part of a proposal that Katie might have put together, is there some way we can capitalize on the fact that Mercy sits on 96 acres, many of which we don't even use.  Property is the most valuable thing on Long Island, Property taxes is one of the big reasons that Mercy is struggling because people pay so much in taxes that they are sending their kids to public school.  I only saw the back end of campus.  When we went on like a field trip to see it, we don't use that property.

It's right on Syosset Woodbury Road, it would be incredibly valuable real estate even just borrowing against that, not selling it, but borrowing against what we own with this intelligent strategic plan could buy Mercy three to five years and if you can't make good on it then you pay back what you borrowed by selling, but it seems like that's a really really valuable option we're sitting on and I wonder if that would be considered as part of a plan going forward.

**Sister Lisa:**  I could only speak to that in light of the conversations that I've had with the Institute Leadership Team whose job is bigger than one ministry.  I mean they have over 1800 Sisters of Mercy that they have to look out for, plus around 25,000 employees and also hundreds of ministries.

What the information that has been given to me is that the property is not being considered.  It is not being looked at for re-purposing and it is not being looked at for sale.  They, I know the SOM are not going to sell and give the money to the school for operations.

For, I've been in the community now almost 40 years and for those 40 years the community has been saying to all our ministries, you must be financially sustainable.  The community does not have the resources that we had nor the staffing that we had, you know for many of you that had all these Siters serving in the school, not making salaries and were doing things, it was a different

time, it was very different. It's just not the same. Um, and you know the property there is part of the home of the Sisters of Mercy and part of their assets and part of the things they have to look at for their future as well. It is, the legalities of church property – there are things that you can and can't do and all of that could play into this picture. You know, it depends on at what level financially and all of that. So, I would say based on the information given to me, no the property should not be considered in any plan.

**Virginia**: I do want to reiterate that the Board of Directors has brought the question of leasing or sale to the Sisters at any time and we have gotten the same answer many times, that that is not a consideration. Suzanne, you said the Mercy Spirit organization, is that supposed to say Mercy First?

**Amanda Corbo:** I think the question is, okay, sorry it says, well Mercy First Organization on the property going to be affected by the school closing?

**Sr. Lisa:** Not to my knowledge, probably people maybe on the Board will know this better than I because I don't deal with the property. According to he city and th town there, the property is considered one parcel. It's not in separate parcels. So, you go and look at the plan, it shows the entire entirety of the property. Mercy First sists on part of that, they do, to my knowledge just as in this case, the Sisters of Mercy own that property, Mercy First does not. There has been zero dialogue around that this would impact Mercy First, they have their own separate corporation, their own set of finances and operate as a totally different corporation.

**Amanda Corbo**: Okay thank you. I think the other questions were answered. Um, although another one just came through: If not repurposing the property are you considering leasing to another educational organization to open a school at this facility?

**Sr. Lisa:** There are no considerations to the property. Yeah, and the question is, was as we did in San Francisco, San Francisco, that school corporation owned their property and buildings. Then when the corporation wind down, then the corporation sold the property to another entity.

The next question is about Cincinnati and this, these two school closures were done, they were not part of Mercy Education so, Mercy Education started in July and all the decisions around these schools were handled totally outside Mercy Education. The community that was in charge of that area closed two schools and then opened another school and there was, in the statement is about, over time sisters had made financial contributions totaling over $9M. I did not sit down and try to determine how much did the Sisters give to OLMA over time for this meeting, but I would imagine it's probably in the millions just as it was there.

So there was a question I could answer, it said how many students put Mercy first
This year actually 55 girls put Mercy first and last year 43 put mercy first.

So we were, you know, embarking on our Mercy Era as we said on our Mercy Errors tour and a lot of people, a lot of the girls, that even did put us second were actually considering us first, they just didn't understand that putting us first, you know, we do take that into account for merit award and things along that line.

**Amanda Corbo:** The next question is, and thank you very much for the well wishes, what is Sacred Heart doing differently?

**Margaret Myhan, OLMA President:** So, Sacred Heart pulls from a different pool and I know that Margaret and Pat can speak to this as well, but they do pull form a different area from Queens where we are pulling from the Eastern Suffolk area. We were increasing our bussing outside the 15 mile radius to attract new students and that was also something that was viable. I think Chaminade's success and St. Dominic's are tow different things. All the schools have their own troubles, but definitely, Chaminade's alumni base, and their Torch Fund is definitely something that contributes to their huge success.

**President Maragret Myhan:** So in terms of Sacred Heart, Sacred Heart is always been much larger than we are. However, in all honesty, they have experienced about the same percentage of decline, but their base is much larger than we are still have a stronger sustainability and as Amanda said, they pull from Queens and in addition, fortunately for them, they have school districts that aren't as prevalent as the ones on the North Shore so many of the families in those school districts are seeking another alternative to public education so that is one of their strongholds that we really don't have.

**Virginia:** I will be happy to answer the question why has the school been closed to holding wedding in the chapel? We would love to hold weddings in the chapel. It is the Diocese of Rockville Centre that does not allow us to hold weddings or baptisms here. We are not, because we are not a Parish, we are not allowed to hold these events in our chapel and, yes, I agree, that would bring a lot of alums back to our school. It's something that we've worked on for a long time.

So there is another request to review some of the questions that were on the document so I'm going to go through a couple of them. Will there be any in person activities or reunions for alumnae?

We discussed that we are trying to plan an event for June.

**Amanda Corbo:** Pat, if you want to elaborate on that

**Pat DiLollo:** We definitely want to do an event and invite everyone back in June and we talked about reunions, I guess depending on what happens with the school, will we be allowed back, I don't' have that answer. Before we had an Advancement Office I was the class rep for my class and I planned all the reunions for my class every five years and we've all stayed very close. I just want to bring up one other topic to think about.

Women's education, all single sex education, the students, the kids, are seemingly going to St. Anthony's and Kellenberg, both co-ed schools who have very healthy enrollment. St. Joe's closed a number of years ago and it left Mercy and Sacred Heart on Long Island. All women's colleges have closed or gone co-ed. If we were to do something different, we would have to reinvent ourselves and that's jus my two cents on that topic. I do feel very – I don't think that parents value single sex education for women, where they do for men. And, just putting that out there.

**Amanda Corbo**: I'm going to disagree with you – I don't think it's the parents, I think it's the students that don't understand the value of it. That's what I was finding this year when I was talking to so many families – the parents were active in the conversation again whereas after changing and things like that that the kids were making the choices and the parents were allowing them to do it, which is not an excuse for anything, but there was a lot of that question and the other thing was that they didn't want to go to a small grammar school to another small high school. Those are just some of the things from the surveys. It's just what we're hearing over the past year or so.

Um, so, people want to know if they can buy merchandise before we close, the answer is going ot be yes, we are going to have a firesale with our merchandise.

**Alumnae Question:** What outreach has been done in the last five years to alert Alumnae to the rising financial pressures on the school? Pat, if you want to jump on this one.

**Patricia DiLollo:** So every appeal that we've sent out has talked about the tuition gap and the need for support for financial aid and scholarships. So, yes.

**Alumnus:** Could I say something before we finish? Hi, this is Anne. Hi everybody. This is my daughter, this is Valerie. I'm a graduate of the class of 94 and I think since before I even had children. I think while I was at Mercy, I was planning on sending any girl that I had to Mercy. So we actually just came to the Open House this fall and got her excited to doing well and to go to Mercy and beyond. So, you know, I cried over this for days when I got this message because it's devastating and I just want to say a couple of things and respond to a few things. And, Pat, I absolutely appreciate what you have done and what you continue to do. This job is not easy and you know, I don't even like to call up people and ask for baseball donations and I think it's a great thing that you guys are doing to profess how great Mercy is and to say you know, this is what we need now and this is what we needed in the past. It's very difficult and especially, absolutely agree with you about COVID. COVID wrecked the world and wrecked the country and people lost lives and this seems to be another possible casualty of that. People are bringing up points about raising money, I think it's a great idea. Like people said, Mercy girls can do anything and I was taught that in this school, by my parents first at home and second in that school, walking the halls and avoiding the Seal and the Senior Stairs that we, you know, got to finally use.

Really important things that still go through us every day and I want to say that I hear Sister Lisa and I think one of the things that I unfortunately had to learn once I hit the outside world was that, sadly, lots of things are businesses that ultimately shouldn't be. I find that medicine is that and I don't like to practice that way and I, even Valerie can tell you, I give time and time and time that not everyone expects and it's not a paid thing and it's just because that's what I was taught. You just need to do what needs to be done and what's right for the world to continue to exist. Mercy goes through us we don't just go through it. I think that if enrollment is down, obviously, it's not just the money that is gonna bring it back. I think there needs to be – I don't know her name, I think Katie said a lot of good things about, we can rally and I think we can do this.

Sr. Lisa sort of tipped the business end of it. I mean it's actually not that much money if you're

talking about all these people who want to get together and we're not talking about "ifs" we are talking how do we do this. I have friends who could not get on this meeting who would be involved monetarily wise and other ways that we would like to be involved.

I think to say that it's a lost cause is not accurate. That's something that I got directly from the school. I think it's a great loss of it actually does go through and I think there is something we can do. Listening to something Sr. Lisa is saying, it was an absolute, if there was an endowment, I think there has to be something that we actually invest in the school, get the enrollment up, bring people and then it's gonna be, you know, keep going but because the enrollment came down, it's just, you know, there's always people that can look back and say, well, this should have been done. But people make the appropriate decisions while they go through it and shouldn't be second guessed and we are in a position right now to say what can we do about it right now and we can possibly reverse it if we can have some good organization and communication.

Those are my thoughts. I am here, I am willing to help in any capacity. I will make the time and I think the other women on this conversation are also saying the same thing. So we are here. Sister Lisa, this is our future right here. We are very opinionated and a lot to handle some times, but that's what the future will be and I think that you know it shouldn't be a business ultimately and it's not being unrealistic, I think we are talking about the land and selling back things like that nature and it's not an option. It should be reexamined. Everyone has to survive and this is a possibility. That would be a great way to go. There are important things that have been done at this school that propagate the message that Mercy set out to do and I think that every Mercy girl has left that school and gone out and done whatever their career is with grace and with love with God and other people and I think that makes a difference. It's not just a private school. It's a Catholic school with a great message and I think we need to keep that going.

**Virginia:** I'd like Sister Lisa to respond to that because the letter that was sent to us, had a very a rather firm stand and Sister Lisa I'd like you to respond to the comment about, um, everybody getting together and changing this.

**Sister Lisa:** When I was there, last week, the question kept coming up. How much do we have to raise and by when? If it's this date or this date? If we do this, if we do that. That is – you know, I think what the firmness in there is – it's not the what if. We can't sit here and have conversations of, well if we raise $3M by the end of May, will you reconsider. Those are the types of discussions we are not willing to engage in, which I think is different than what Katie has talked about. Katie, to me, has talked about definite long range plan but with numbers really backing it and probably dollars, I'm assuming, that we would add and that would be a discussion about real concrete things, not the what ifs. So I see them as two separate questions and I think, you know, we don't have any real numbers in front of us. I don't know if that clarifies or not, but.

**Amanda Corbo:** I have one more question. Pat and I will go through the questions tomorrow and make sure that they are all answered so that when we send out the link to the video for this meeting we will make sure all the questions are answered that were submitted. I also want to let you know that the technical difficult, it said only 100 people could get in here. I went in and upgraded and did everything. It certainly was not intentional – I didn't realize it was going to

block people the way it did, it told me I could have up to 300 people and clearly that's not the truth because people got knocked out so we will have a conversation past that as well.

Ok, this is a good one to kind of get everybody back together. What is the plan for the faculty and the students? Where are they going? What are they going to do? Sports Night? What if more teachers and administrators resign? Margaret, maybe if you want to start with that.

**Margaret Myhan (OLMA President):** That's a tough one to answer, Amanda. We are hoping faculty and staff will remain with us till the end of the year, we have made a commitment to them that they will be paid through the end of the academic year. I am interested in Katie's plan in terms of a concrete plan for turning this around and what is the timeline associated with that and how do we get started to make that happen in a relevant short term, turnaround because all intensive purposes we probably lost the incoming class. They have been notified that we are closing so, chances are they have or will make other decisions and I think if I was a parent of an incoming student, I'd say, what's the guarantee my daughter will graduate even if you are turning things around. I think it's important that we agree, if wea re going to do a plan, what is the plan going to be and what is the time frame to make that plan happen?

**Pat DiLollo:** As far as the question about what are we doing of rout students, we met with the Principals of all the high schools that came in last week. There is a plan in place to make a transition as easy as possible for them so they are working with us and they are actually encouraging the students to stay through this year. And with the faculty and staff, any of you that are in education, certainly when the time comes, they will, it would be great if we could help them find….

**Margaret Myhan (OLMA President**): To Pat's point, when we had the meeting with he Principals of other Catholic schools we made that a priority that if any of the schools are looking for people or replacement for those who might be retiring or leaving, we asked that they would take our faculty or staff into consideration for any of the needs they may have. All 8 schools agreed that they would certainly be willing to give any consideration to our faculty and staff.

**Amanda Corbo:** Okay. Just look one more time really quick.

**Margaret Myhan (OLMA President**: If I could just jump in. Katie has made it over here to you know the group is gathered here tonight to keep us beyond resuscitation and what might that look like and what is the time frame so to Sr. Lisa's point to make that a real consideration I think we have to share how we approach that.

**Katie Weiland ('01):** Absolutely. Here's what I would share for the short term. Sr. Lisa, thank you for your grace here. But I think that in order to have a more meaningful conversation we have to have more numbers, real financials. Pat, that may be some numbers from your office from a fundraising perspective, right? We need to understand enrollment, what enrollment projections look like, what have they looked like in the past to make them kind of bloom, what has caused some of those to deteriorate.

We know a lot of things are going on in education right now.  Gen Z and millennials are having less and less kids.  We know that colleges are closing.  It's no surprise that that's happening here at the high school level as well.  But I think we need some of those numbers and then we need to understand staffing numbers, right.

We know that 60% of a school-based budget sits in staff.  And so we understand the right that many Sisters of Mercy have either retired or gone on to be with the Lord and that is shifted you know the dynamics of the school.

I think there's a lot of things we all need to understand from the Board of Directors of Mercy.  And, so would love to have a partnership and conversation with them.  They are, I think form an enrollment perspective, I know that, you know, a lot of folks said, Hey, listen, we may not have a freshman class.

I would argue to say you may have a freshman class, it may also be small.  However, it's not just about our freshman class we would think about recruiting.  It's about, who are our sophomores, who are our juniors that can bring into the school.

There are you know I understand we have a catchment area.  But I will tell you from the class of '01, there are girls who came in from Floral Park.  So, I think all of those pieces need to be put into place to really understand what, what the budget is, what the run rate is.

And then Sister Lisa with your good support we also need you to understand how much have we been going over.  The reality is that you all have been at Mercy sustaining the organization for some time giving us some allowances.  We need to know what those numbers are to give ourselves a plan from a fundraising perspective.

You know, truth be told, I would love to be able to say, Sister Lisa, here's the plan to get our seniors graduated to get our juniors graduated and our sophomores and in doing that, right, how how are we augmenting our practices across the entire organization from an operational, marketing, fundraising, talent perspective, such that we are able to rebuild.

I think it's possible.  I also would implore the group of ladies and gentleman, we are going to have to become the Sisters of Mercy.  We are going to have to give in kind talent here in the short term.  I know that myself I'm dedicated to doing that.  Happy to support on budgeting and talent activities.

I do think that we need to get together a working group.  I am happy to facilitate that.  From a timeline perspective, Sister Lisa, you need to let us know, when you need things, right?  So that we can backwards plan, former teacher here.  So, of backwards planning, I think that' show I see our go forward.

If we are ll open to having a conversation, if we can get real action, real numbers, real owners together, Mercy girls don't quit.  And the Circle of Mercy is infinite.

**Virginia:** Sister Lisa, Id' be very interested to hear you respond to that.  Considering the fact that the Board did put forward proposals to allow us to hold off this decision until the end of the school year and we were told that that was not under consideration. I'd like to hear your response to that.

**Sister Lisa:**  The Board asked, said we don't want this decision made until May.  Mercy Education said that was unacceptable.  That, the decision and the announcement needed to be made before an incoming class was accepted.  And people may agree or disagree whether it's in fairness or not, or if it would have been better or not.  Um, you know, Mercy Education took the stance of there was, you know, there is no money for the school to go into next year.

**Katie Weiland ('01):**  Right. Right.

**Sister Lisa:**  Pocket is zero.  This is, Mercy Education, you know, we're the, Mercy Education has no money to put into the school for financial support.  The Sisters of Mercy have done what they can.  And, you know, there is nothing else on the table for that.

Um, so, again, we have to move forward. The school is in transition to the closure.  Now, if you know, somebody comes to us and says we have $20M promised right here, what can we do?  Then I can, we can look at that, but right now there is nothing on the table for us to look at and it's not like we can reach out to these people and see if they are wiling to donate.  We have to have something more concrete because wea re moving forward with this plan, so I don't know I can give you a timeline.  Is it in September or whatever and it might be, do we have to close to reopen, something different, a whole 'nother ball game.

Something different.  I don't have the answer to that.  So, you know, we are not going to allow the decision to wait until the end of May to be announced.  We did not believe that was fair to anyone and that it needed to be put out there to everyone.

**Virginia:**   That's correct, although we did offer proposals, we did offer some different proposal that maybe we can't discuss right now and we were told, "Under no circumstances," we have a letter that says, "There will be no further discussion", and it's just, it's frustrating to us on the Board of Directors.

**Sister Lisa:**  There will be no more discussion.  There is no more discussion about the moving of the school unless there is something concrete pulled in.  Just as I said, I am not going to look at somebody and say, take your 20 million dollars and go give it to somebody else.

**Katie Weiland '01:**  Sister Lisa, here's what I'm hearing you say, and, Virginia, tell me, tell me if this also gets what you're getting at.

What I'm hearing Sister Lisa is, if we can have a concrete plan that touches on all the elements of running a school and has commitments upwards of $20Million, which is the number I'm hearing and does not, you know, I get it – I've done school-based budgeting, it's not a crazy number that you're saying, we can come to you with commitments that show you how we can get the revenue, how can we constrain that over time, what our plans are concretely, action owners, timelines, and things in writing, meaning: X person is going to donate a million dollars, timelines, and things in

32

writing, meaning X person is going to donate a million dollars. X person is going to do $5M. X organization is going to grant us $5M over the next 5 years and you can see a go forward plan that concretely allows the Sisters of Mercy as well as Mercy Education to not have to put additional dollars into the school and to remain open, is that a conversation you're willing to have?

Virginia, you may have done all those things and that's fantastic. I think we all, you have sisters around you here, we all need to come with that plan.

Now, what I'm also hearing Sister Lisa say, and I'm getting some nods from you now, Sister Lisa, so I'm hopefully I'm picking up what you're putting down. We still have to go forward with the transition plan.

Now, here's what I would tell you, as a school leader, right, and as a leader who has managed coach, uh, principals before. This is called the intent to return time, right?

So, if you are a kiddo, if you are a teacher, if you are a school leader, your leadership team is having a conversation to say, hey, here's how you doing with the kiddos to mid your conversation, here's where I'd like to see you grow. And by the way, are you coming back next year?

So, I deeply understand that this is the traditional time in education where you have these conversations to allow folks to be able to know where they're going to go. Same thing for teachers, if they're not, you know, using their God-given talent, then they should be doing something else, you let them know right now so that they've got time to find a new opportunity when the paychecks stop in June.

So I hear all that, but, Sister Lisa, am I summarizing what you're telling us correctly?

**Sister Lisa:** Yes.

**Katie Weiland:** Okay, thank you.

**Amanda Corbo:** Alright, one last question is from Katie Cook. Katie couldn't get onto the call. She finally got on so she wanted to know, so Pat, this is going to be a little redundant for you but she said, what about the money from the capital campaign specific to OLMA? Sorry if this question was asked, but I could not get on the call.

**Patricia DiLollo:** In terms of the Capital Campaign, owe have raised $6.4M MILLION. We have a million and a half outstanding in pledges that probably will not come in and I know that's a question for those there might be some of you on here that have pledged. Certainly, you know, you can tell. If there's a saying that we're, you know, we're at zero by the end of the school year that it would be helpful if you continue to pledge, but we understand the reasons why they may not so I'm not sure we're going to see that money.

Some monies were spent on renovations for the school. Others are in restricted funds for the endowment. Some of the donors are asking for that back so that's basically where we stand. We used the monies that we collected for our operating budget as well.

**Amanda Corbo**:  I do have the questions in the chat box that I will make sure that they will be answered in the other document that we are putting together with our minutes.  Um, But I think that I can say thank you to everybody for your time and for your incredible insight and for your love for Mercy.  If anybody else wants to chime in and say anything, um.

**Maggie Ewen '07:**  I just want to say I'm really happy so many people attended this meeting and of course I am blown away and pleasantly surprised to see the support that Mercy has been seeing in light of this absolutely devastating news.  I just want to emphasize to everyone on this call, I think we've really come a long way in sort of understanding that we are all on the same page and we all want the same things  I just want to caution against us working in silos.

Let's work together.  If we're gonna do this, let's all do this together and you know, try to continue having the productive conversations that I think we've been having this evening.  Thank you.

**Kiera Liantonio, LMHC:**  As a follow up to that, Kiera Liantonio, Class of 2012.  I wanted to ensure, because I haven't been receiving any of the emails from the communications that had been going on regarding like this meeting, the only reason that I was able to find the link was because of Ms. Jenn Yatco, who was a former teacher of mine.  So I wanted to ensure that any of the communications and things going forward in terms of like, what we need to do to volunteer what we need to do kind of mobilize, how can we make sure that our contact information is with you guys?

**Amanda Corbo:**  So, just so you know, if in the past, if you even accidentally unsubscribed from an email, you are not receiving our emails.  So if you do feel that you're not receiving emails, please email me directly at A-C-O-R-B-O at OLMA dot org and I will go into the system and send you a resubscription email so that I can add you on so that you get all of the information.  I'm not saying that you did unsubscribe, but it sometimes happens even when you look on a phone.

[…]

**Liz Finnerty '79:**  Can I just say one thing, sorry, first of all.  Hi Liz Finnerty, Class of '79.  I went to Mercy kicking and screaming and after two weeks I thought it was the best place ever and had an incredible experience.

Pat, you've done an incredible job over the years.  I loved working with you at different times.  Sure, everybody on this call, we could have done more.  And I feel badly that, you know, we're all trying to rally now to do that.

On another note, I am really so disappointed with Mercy Education and the philosophy that, you know, there, I feel like they're giving up.  They're giving up in a day when in an age and a country in a world when women need to be empowered, and, yes, it's hard to convince parents but they are the parents, they're the ones who are supposed to be making the decisions to send girls to an all girls school.

I feel badly that the rumors were out there that the school was closing and that we didn't know or we didn't do enough to squelch all those rumors.  Sister, Lisa, I give pause to the fact that you are part of a Mercy Education and the whole order of the vow was to educate young women and to empower them and to serve the poor and I feel like you are really just slamming the door on that.

We raised $6 Million dollars very quickly over the last, for our Capital Campaign, wasn't that significant, wasn't that a sign to you that the school has potential, the school has a future, you know.  We have fifty-five girls that put it as our school is choice number one.

That means they were giving up spots on other places that have waiting lists or that were overcrowded.  You're really slamming the door.  You're blindsiding all of us.  And there is a place for this school in this community, in this state and you're really slamming the door on all of us and the future of women.

We're supposed to stronger, to be leaders.  You've gotten rid of Leaders' Club, I don't know why, but, you know, you're slamming the door on that and I am just sad.

I'm angry and I'm completely disappointed and disheartened in the Order.  It's just really disheartening.  I wanted to say thank you to everybody who has done a great job at the school to make it a great place for me, for my girls, and I was hoping, for my granddaughters.

So, perhaps we could continue the conversation.  Thank you to everybody and thanks for this platform this evening.  I look forward to working with everybody in the future.

[Whereafter the meeting concluded.]

## PARTIES

57.    Plaintiff, Amanda Reynolds, is an individual, natural person who presently resides in Nassau County, New York.

58.    Plaintiff is an alumnus of Our Lady of Mercy Academy's Class of 2001.

59.    Plaintiffs similarly situated to Plaintiff are those alumnae and donors of the school who have a vested interested in their high school alma mater.

60.    Plaintiffs similarly situated to Plaintiff shall also include the alumnae and donors of those other Catherine McAuley and other Catholic-sponsored educational institutions that have been forced to close at the hands of institutional defendants due to malfeasance across the country who are not yet identified, but whom further discovery shall reveal exist.

61.    Defendant, Mercy Investment Services, Inc., is a foreign, not-for-profit corporation with a principal place of business located at 2039 North Geyer Road, Saint Louis, Missouri 63131.

62.    Defendant, Mercy Education System of the Americas ("MESA") is a sponsored ministry of the Institute of the Sisters of Mercy of the Americas.

63.    Defendant, MESA's, principal place of business is located at 8403 Colesville Rd., Silver Spring Maryland, 20910.

64.    According to its website, MESA's Mission Statement is as follows: "The Mercy Education System of the Americas is rooted in the Gospel, through the Catholic faith and the Mercy charism.  Inspired by Catherine McAuley, Mercy Education nurtures highly competent and deeply compassionate leaders to serve a vulnerable world."

65.    MESA claims it has a firm Catholic identity: "The school gives evidence of its Catholic Identity in its curricular offerings, prayer and liturgical life, retreats and service opportunities."

66.    Defendant Sisters of Mercy of the Americas Mid-Atlantic Community, Inc., ("Sisters of Mercy") is a foreign, not-for-profit corporation pursuant to Section 1304, registered in New York.

67.    Defendant, Sisters of Mercy maintains a principal place of business located at 1437 Blossom Road, Rochester, New York 14610.

68.    According to its bylaws, Defendant, Our Lady of Mercy Academy, is a New York State non-profit educational corporation.

69.    Defendant, Our Lady of Mercy Academy's principal place of business is located at 815 Convent Road, Syosset, Nassau County, New York 11791.

70.    According to its bylaws, the Mission of the Corporation shall be the operation of a Catholic high school for young women, where the arts and sciences are taught and diplomas and honors are conferred in furtherance of and consonant with the system of motivating beliefs, concepts and principles as set forth in Statement of Philosophy.

71.    According to its website, "the defining characteristic of the school is a focus on faith, compassion, and promise in educating young women to achieve their fullest potential."

72.    According to its website, Our Lady of Mercy Academy is sponsored by the Sisters of Mercy of the Americas and these qualities reflect the Mercy Mission.

73.     Defendant, The Board of Directors of Our Lady of Mercy Academy, is comprised of individuals with a principal place of business located at 815 Convent Road, Syosset, Nassau County, New York, 11791.

74.     Upon information and belief, the Board of Directors of Our Lady of Mercy Academy is guided by Church governance, canonical and civil law and includes OLMA's President, Margaret Myhan and Zully Petrucci, Principal.

75.     Defendant Margarete Myhan, OLMA President, is a natural citizen who maintains an office address at 815 Convent Road, Syosset, Nassau County, New York who is believed to reside in Suffolk or Nassau County.

76.     Defendant Patricia DiLollo, OLMA's Director of Advancement, is a natural citizen who is employed by OLMA and who maintains an office address at 815 Convent Road, Syosset New York at OLMA and who is believed to reside in Suffolk or Nassau County.

## GOVERNING DOCUMENTS

*OLMA ByLaws*

77.     According to the bylaws, The Board of Directors governs the affairs and business of the Corporation, and consists of not less than nine or more than twenty-five persons, two of whom shall be Sisters of Mercy.

78.     The Terms of election for the Directors shall ordinarily be four years.  A Director may be elected to two consecutive terms.

79.     A Director may resign at any time by giving written notice of his or her resignation to the Secretary of the Corporation.

80.     The President of School shall automatically be a member of the Board of Directors as long as she or he remains in that office.  The Principal of the school is a non-voting member of the Board.

81.     The Board of Directors shall meet as often as it specifies, including an Annual Meeting, Regular Meetings, and Special Meetings.

82.     A quorum on the Board is the presence of one-half of all qualified Directors required for a valid transaction of business at any meeting.  Each Director shall have one vote.

83.     General Powers of the Board include: (a) recruiting, selecting and recommending an eligible candidate to serve in the position of President of the school for ratification by MESA; conduct an annual appraisal of performance of the President; identify mutual goals and arrange appropriate compensation and related benefits; (b) Advise the President in the recruitment and selection of an eligible candidate to serve in the Position of Principal of the school; develop short and long range plans for the school to ensure the School's viability; review, evaluate and revise the Mission, Purpose and Philosophy and recommend to MESA for approval; (e) develop and approve major policies, including the setting of tuition and fees, employee and compensation policies, which guide the direction of the School; (f) provide through the President for adequate maintenance, upkeep and supervision of the land, buildings and other assets of the Corporation;

84.     General Powers of the Board, include also: (g) insuring sound fiscal management through implementation of good accounting principles and procedures; insure an annual audi tan develop and approve an annual operating budget except where such operating and capital budgets require the approval of MESA.

85.     The Board's General Powers also include electing the Chair, Vice Chair, Secretary and Treasurer of the Corporation and to nominate, for approval by MESA, candidates for the Board of Directors.

86.     Under Section 8 of the Bylaws, "Compensation", Directors as such shall not receive any compensation for their services; provided, however, that nothing herein contained shall be construed to preclude any Director from serving the School in another capacity and receiving such compensation therefore as shall be approved by a quorum of disinterested Directors, except for reimbursement of such out-of-pocket expenditures as shall be approved by the Board of Directors.

87.     Under Section 9 of the Bylaws, "Directors and Qualifications", Directors should have specific experience in organizational operations (e.g., administration, finance, public relations, personnel, and program development), and sign an annual conflict of interest and confidentiality statement, among other things.

*Executive Committee*

88. Under Article V of the Bylaws, entitled, "Executive Committee," the Executive Committee shall consist of the Chair of the Board, the President and up to three (3) other Board members, selected by the Chair and approved by the Board of Directors.  The Chair of the Board shall also chair this committee.

89.     Between meetings of the Board, the Executive Committee may take such action as authorized by the Board and, in exigent circumstances, the Executive Committee may act on behalf oof the Board with the same effect as an action of the full Board.  The Executive Committee shall report all of its actions to the Board at the next meeting of the Board.

90.     Pursuant to Article V, Section 2 of the Bylaws, the Executive Committee has all the powers of the Board, except it cannot: (a) amend or repeal any resolution previously adopted by the Board of Directors; (b) establish a budget, except that it may approve an interim operating budget until such time as the Board can meet to establish one; approve any recommendation or report to the Board of Directors made by any committee, or (d) appoint or remove from office and Officer of the Corporation other than the Chair.

91.     Pursuant to Article V, Section 4, "Records and Reports", the Executive Committee is responsible and accountable to the Board of Directors; minutes of meetings are to be recorded and fully reported at the next meeting of the Board of Directors; actions taken shall be ratified or they may be rescinded or modified as deemed necessary by the Board.

92.     Article VI, "Other Committees", Section 1 of the Bylaws states the Audit Committee shall be composed of independent directors; it shall oversee the accounting and financial reporting processes of the corporation and the audit of the corporation's financial statements, annually retain an independent auditor, and review the results of the audit and any related management letter with the independent auditor.

93.     Pursuant to Article VII, Section 1, "Officers of the Corporation," the officers of the Corporation shall consist of a President, a Vice-President, a Secretary and a Treasurer.  The President shall

94.     Pursuant to Section 2, "Responsibilities," subsection (a), "President," the President of the School shall be the Chief Executive Officer and have general charge and supervision of the business.  She shall be ex officio a non-voting member of tall committees appointee by the Board of Directors and shall make such reports of the affairs of the

41

Corporation as the Board may require.  The office of the President of the Corporation and the School President shall be held by the same individual.

95.    Pursuant to the Bylaws, Article VII, Section 2(b), the Vice President shall act in the absence of the President and shall perform such other duties as required.

96.    Pursuant to the Bylaws, Article VII, Section 2(c), the Secretary of the Board shall record all votes and prepare minutes of all proceedings of the Board of Directors; these records shall be maintained in the offices of the School and a current list of the names and addresses of all Directors shall be on file and available.  Notice of meetings and such other duties as described in the By-laws or requested by the Board shall be performed by the Secretary.

97.    Pursuant to the Bylaws, Article VII, Section 2(d), the Treasurer of the Board shall have general charge of the financial affairs of the Corporation and the care and custody and disbursement of its funds and securities, and shall deposit all funds and securities of the Corporation to the credit or in the name of the Corporation in such banks, trust companies, or other depositories as may be selected from time to time by the Board of Directors.  The Treasurer shall insure that accurate records of all financial accounts and transactions are maintained and available to any Director and the Chair.  In collaboration with the Chair, financial statements shall be prepared and an annual audit conducted if designated by the Board of Directors.  The Treasurer shall also perform such other duties as may be assigned from time to time by the Board of Directors or the Board of the President of the School.

98.    Pursuant to the Bylaws, Article VII, Section 4, "Vacancies", Any vacancy caused by death, incapacity, resignation or removal of an Officer of the Corporation shall

be filled by the Board of Directors at a duly constituted meeting thereof, subject to the limitations of Section 1 of this Article.

99.    Pursuant to the Bylaws, Article VIII, "Staff of the School," Section 1 "Principal," the office of Principal shall be responsible for the daily operation and management of the school and in collaboration with the President shall provide leadership and direction for the long term interests and welfare of the School in accord with the priorities and directives of the Board and the President.

100.    Pursuant to the Bylaws, Article VIII, Section 2 "Business Manager," the Business Manager, under the general direction and supervision of the President of the school, shall perform such duties and have such administrative powers as the President shall from time to time delegate to this office.  Additionally, the Business Manager shall perform such day-to-day functions as delegated by the Treasurer of the Corporation and shall keep and maintain such financial records and shall prepare such reports with respect thereto as the Treasurer of the Corporation shall reasonably require.

101.    Pursuant to the Bylaws, Article IX, "Execution of Documents." all checks, drafts, orders and other similar instruments for the payment of money including the regular payroll shall be executed by any two of the following: the President of the School, Treasurer of the Corporation, or the Business Manager.  No check or other instrument for the payment of money to the School shall be endorsed otherwise than for deposit to the general account of the School unless otherwise restricted by the payee.  All checks of the School shall be drawn to the order of the payee.  Each bank account of the School shall be stablished and continued by resolution of the Board of Directors.

*Indemnification*

102.    Pursuant to the Bylaws, Article XII, governing Indemnification of Members, Directors, Officers and Staff, the Corporation is responsible for indemnifying its members if the member acted in good faith and was not the cause of said action and had no reasonable cause to believe her conduct was unlawful.

103.    There is no Article XIII.

*Conflicts of Interest*

104.    Pursuant to the Bylaws, Article XIV, "Conflict of Interest", "any conflict of interest on the part of any member of the Board of Directors should be disclosed to the other Directors and made a matter of record when the possible conflict relates to a matter of Board action.  Any Director having a possible conflict on a matter before the Board of Directors should not be counted in determining the quorum for the meeting at which action is taken on the matter, even when permitted by law.  The minutes of the meeting should reflect that disclosure of the possible conflict of interest was made, that the interested Director abstained from voting and that her presence was not counted in determining a quorum.  These requirements should not be construed as preventing a Director from stating her position on the matter on which she may have a possible conflict of interest, nor from answering questions of other Directors, recognizing that the Director's knowledge may be of great assistance to the Board of Directors.

*Dissolution*

105.    Pursuant to the Bylaws, Article XV, "Dissolution", "upon dissolution, merger, or consolidation of this Corporation, all property of the Corporation after payment of any debts shall devolve upon the Sisters of Mercy of the Americas, Inc. a Missouri Not-for-Profit Corporation, or its successor according to a plan adopted by the Members of the Corporation and approved by the Members of the Corporation prior to submission to a Justice of the Supreme Court in New York,

provided that at such time, any recipient of remaining funds shall qualify as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986 as amended.

106.   The OLMA students, parents and Alumni were never informed of any dire financial distress the school was undergoing in the last 10 years.

107.   The OLMA students, parents and Alumni and other friends of Mercy contributed donations at the soliciting of Defendants, OLMA, its agents and subsidiaries, relying upon the promise that the school would remain open.

108.   The OLMA students and parents paid tuition to the school with the understanding that the school was going to remain open for the four years, from 9th through 12th grade, that were intended by the payment of such tuition.

### FIRST CAUSE OF ACTION – Fraud

109.   Plaintiffs repeat, reallege and reiterate all foregoing paragraphs as if fully set forth herein.

110.   Defendants owed Plaintiffs a duty to act responsibly, in a manner in accordance with their duties and responsibilities with respect to Defendant entities.

111.   Defendants made material misrepresentations or omissions of fact

112.   Defendants' material misrepresentations or omissions of fact include, but are not limited to, representations that the monies paid would be used in accordance with Plaintiffs' intentions; that the monies paid would be used for the benefit and viability of Our Lady of Mercy Academy; and that they were soliciting such payments for that purpose; that OLMA's property is not postured for sale or alienation in any way whatsoever.

113.    Defendants made these statements or included these omissions with knowledge of their falsity.

114.    Defendants made these statements and/or omissions with the intent to defraud Plaintiffs and the community;

115.    Plaintiffs reasonably relied on these statements when they paid these monies and/or agreed to pay tuition; agreed to attend Our Lady of Mercy Academy; agreed to work at Our Lady of Mercy Academy; agreed to fundraise and contribute time, efforts, and talents for the collective benefit of Our Lady of Mercy Academy; in that Defendants stated they would entertain fundraising efforts by the stakeholders when, in fact, they have no intention of doing so, among other things.

116.    Defendants' breach of duty resulted in damages to the Plaintiffs.

117.    Defendants' breach of duty is the but-for cause of Plaintiffs damages.

118.    Defendants' breach of duty is the proximate cause of Plaintiffs' damages.

119.    Defendants breach of duty was the proximate cause of Plaintiffs' damages.

120.    Plaintiffs in no way contributed to their own damages.

121.    Plaintiffs sustained damages in many forms including monetary damages, and will sustain the loss of Our Lady of Mercy Academy, an irreplaceable all-girls Catholic school.

**SECOND CAUSE OF ACTION – Breach of Fiduciary Duty**

122.    Plaintiffs repeat, reallege and reiterate all foregoing paragraphs  as if fully set forth herein.

123.    A fiduciary duty existed between Defendants and Plaintiffs.

124.     Defendants' fiduciary duty created a relationship of trust and confidence whereby Defendants were bound to exercise the utmost good faith and undivided loyalty toward Plaintiffs and to Our Lady of Mercy Academy, throughout the relationship.

125.     This fiduciary duty also required Defendants to act in a trustworthy manner, with honesty, and with the best interests of the company in mind.

126.     This fiduciary duty was created by statute.

127.     This fiduciary duty was created by circumstances underlying the relationship between the parties and the nature of the transactions at issue.

128.     Defendants breached their fiduciary duty owed to Plaintiffs when they acted for their own benefit, rather than for the benefit of Our Lady of Mercy Academy, and, it follows, its students, employees, alumni and community.

129.     Defendants breached their fiduciary duty when they violated their own Bylaws.

130.     Defendants breach of duty was the but-for cause of Plaintiffs' damages.

131.     Defendants breach of duty was the proximate cause of Plaintiffs' damages.

132.     Plaintiffs in no way contributed to their own damages.

133.     Plaintiffs sustained damages in many forms including monetary damages, and will sustain the loss of Our Lady of Mercy Academy, an irreplaceable all-girls Catholic school.

**THIRD CAUSE OF ACTION – Breach of Contract**

134.     Plaintiffs repeat, reallege and reiterate all foregoing paragraphs as if fully set forth herein.

135.     Defendants and Plaintiff stakeholders entered into a contract whereby Plaintiffs paid money in the form of tuition and donations intended to inure to the benefit of Our

Lady of Mercy Academy and other affected schools and its viability in exchange for Defendants' educational services.

136.    Defendants misappropriated monies paid by Plaintiffs for other purposes not intended for the use of Our Lady of Mercy Academy as intended by Plaintiffs at the time the money was paid.

137.    Defendants owed Plaintiffs a duty to use the monies donated and paid responsibly and in accordance with Plaintiffs' intentions.

138.    Defendants breached their duty owed to Plaintiffs when they misappropriated and misdirected Plaintiffs' money.

139.    Defendants' breach of duty is the but-for cause of Plaintiffs damages.

140.    Defendants' breach of duty is the proximate cause of Plaintiffs' damages.

141.    Defendants breach of duty was the proximate cause of Plaintiffs' damages.

142.    Plaintiffs in no way contributed to their own damages.

143.    Plaintiffs sustained damages in many forms including monetary damages, and will sustain the loss of Our Lady of Mercy Academy, an irreplaceable all-girls Catholic school.

**FOURTH CAUSE OF ACTION – Breach of Contract**

144.    Plaintiffs repeat, reallege and reiterate all foregoing paragraphs as if fully set forth herein.

145.    Plaintiff students are expressly and impliedly third-party beneficiaries of the lease agreement between and/or among Defendants.

146.    Plaintiff students enjoyed the use, possession and operation of Our Lady of Mercy Academy's campus.

147.     The breaches of contract among defendants with respect to the lease agreements resulted in a breach of their duties owed to Plaintiffs, who are third-party beneficiaries of the lease agreement, expressly and impliedly.

148.     Plaintiffs will sustain damages upon the closure of Our Lady of Mercy Academy in that they will no longer have a high school to attend.

149.     Defendants breached their duty owed to Plaintiff in the failure to renew the lease and will breach their duty owed if they fail to permit Our Lady of Mercy Academy to stay open for its students.

150.     Defendants' breach of duty is the proximate cause of Plaintiffs' damages.

151.     Defendants breach of duty was the proximate cause of Plaintiffs' damages.

152.     Plaintiffs in no way contributed to their own damages.

153.     Plaintiffs sustained damages in many forms including monetary damages, and will sustain the loss of Our Lady of Mercy Academy, an irreplaceable all-girls Catholic school.

### FIFTH CAUSE OF ACTION – Unjust Enrichment

154.     Plaintiffs repeat, reallege and reiterate all foregoing as if fully set forth herein.

155.     Defendants were enriched through Plaintiffs' payment of money, donation of time, talents and fundraising;

156.     Defendants were enriched at Plaintiffs' expense;

157.     Defendants' enrichment offends equity and good conscience to permit them to retain what is sought to be recovered.

### SIXTH  CAUSE OF ACTION - Equitable Estoppel

158.     Plaintiffs repeat, reallege and reiterate all foregoing as if fully set forth herein.

159.    Plaintiffs detrimentally relied on Defendants' promise to utilize the monies paid for the benefit of Our Lady of Mercy Academy.

160.    Defendants' promise was a promise which Defendants should have, and did, reasonably expect to induce action on the part of Plaintiffs to third parties and did induce such action.

161.    Plaintiffs' reliance was reasonable for reasons including that they were paid in the form of time, tuition and donations and other forms of money.

162.    Injustice can only be avoided by issuing to Plaintiffs fair damages in addition to specific performance.

**SEVENTH CAUSE OF ACTION – VICARIOUS LIABILITY**

163.    Plaintiffs repeat, reallege and reiterate all foregoing paragraphs if fully set forth herein.

164.    Defendants are vicariously liable for the actions perpetrated by their employees, agents, and/or subsidiaries

165.    Defendants maintain ownership, operation, control, and governance over the defendant subsidiaries.

166.    To the extent that Plaintiffs were damaged by act and/or omissions perpetrated by Defendants in their course of employment, the overarching Defendants are imputed liability vicariously herein.

167.    To the extent that Plaintiffs were damaged by acts and/or omissions perpetrated by Defendants outside the scope of employment, those Defendants are personally liable for damages.

## JURISDICTION

168.    This Court has jurisdiction over all causes of action alleged in this Complaint by reason of diversity of citizenship of the parties, and the amount in controversy is over $75,000. Plaintiffs reside in Nassau County and are situated throughout the United States, and Defendants have principal places of business in New York, Maryland and across the United States.

169.    Venue is proper in this Court because a significant number of Plaintiffs reside on Long Island, Our Lady of Mercy Academy is in Syosset, Nassau County, New York, and Defendants' substantial witnesses and agents reside or work in New York.  Venue is proper pursuant to 28 U.S.C Section 1391 because a substantial part of the events giving rise to this claim occurred in this District.  Defendants are authorized to conduct business or reside in this District and have intentionally availed themselves of the laws and markets within this District.

170.    Federal questions of law will be further revealed during the course of discovery.

171.    This Honorable Court also has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d).  Upon information and belief, the aggregate claims of the individual Class Members exceed the sum or value of $5,000,000.00, exclusive of interest and costs; there are more than 100 putative class members, defined below; and there are numerous members of the proposed class who are citizens of a state different from defendant.

172.    This Court has personal jurisdiction over Defendants.  Defendants operate widely throughout New York State.  Defendants conduct substantial business in this state and District and because a substantial part of the acts and omissions complained of occurred in this State and District.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

1.  That the Court determine the claims brough by the Class may be maintained as a class action; That judgment be entered n favor of Plaintiffs and against Defendant;

2.  For an award of damages, including actual, nominal and consequential damages, as allows by law in an amount to be determined;

3.  For punitive and treble damages, if permitted by law;

4.  For prejudgment interest on all amounts awarded;

5.  That Defendants, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract having a similar purpose or effect, and from adopting or following an practice, plan, program, or device having a similar purpose or effect.

6.  That Defendant Board Members and Defendants' entities be ousted from the operation of Our Lady of Mercy Academy.

7.  That Defendants collectively provide an accounting of documents to Plaintiffs, who will gather for the restructuring of the school and repurposing of a new Board;

**Compensatory Damages**

8.  Plaintiffs repeat, reallege and reiterate paragraphs "1" through "85" as if fully set forth herein.

Money damages along are insufficient and inadequate to accomplish justice.

9.  The subject of the contracts are unique.

10. There is certainly uncertainty in calculating damages.

11. It is not difficult for the Court to supervise the award of compensatory damages in this case.

12. Compensatory damages would not cause hostile parties to work together in this case where ouster of the Board of Directors is necessary.

## Restitution

13. Defendants were unjustly enriched.

14. Defendants' unjust enrichment inured at Plaintiffs' expense.

15. It would be unjust to allow Defendants to retain the benefit of monies paid at Plaintiffs' expense.

16. Plaintiffs did not pay the monies to Defendants as a gift to Defendants, but for the benefit of Our Lady of Mercy Academy.

17. The benefit of Defendants' unjust enrichment must be restored to Plaintiffs for the benefit of Our Lady of Mercy Academy.

## Lost Profits

18. Plaintiffs allege lost profits to the extent that lost profits will be incurred if Defendants, as the breaching party, do not perform its agreed-upon contractual obligations and/or are directed to specific performance, along with potential collateral exchanges.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury for all causes of action, claims or issues in this action which are triable as a matter of right to a jury.

DATED:  January 18, 2024
Woodbury, New York

BY:  Amanda S. Reynolds
Amanda S. Reynolds, Esq.
Attorney for Plaintiffs
3 Harvard Drive
Woodbury, NY 11797
InMercyAmandaReynolds@gmail.com
(516) 838-0715